JAMES A. WILLIAMSON and )
DAVID MITCHELL, )
                        )
      Plaintiffs, )
                        )
      v. )        No. 2:11 CV 336
                        )
GRAPHIC 22, INC., )
an Indiana corporation, )
                        )
      Defendant. )

## OPINION AND ORDER

This matter is before the court on defendant Graphic.22 Inc.'s ("defendant")

motion for summary judgment on plaintiff James Williamson and David Mitchell's

("plaintiffs") employment discrimination claims. (DE # 21.) Plaintiffs have filed a

response (DE # 23), and defendant has filed a reply (DE # 26). For the following

reasons, defendant's motion is granted in part and denied in part.

## I.     Background and Facts

### Defendant

Defendant is an Indiana Corporation that operates a printing shop in Chesterton,

Indiana.[1] (DE # 21-1 at 4; Busch Aff. ¶ 2.) Defendant creates promotional items,

---

[1] The following facts are taken from defendant's statement of material facts
(DE # 22 at 1) and portions of the record referenced in plaintiffs' response brief
(DE # 23). As defendant correctly points out in its reply brief (DE # 26 at 2), plaintiffs'
response brief does not comply with N.D. IND. LOCAL RULE 56.1(b)(2), which
requires a summary judgment response brief to include a "section labeled 'Statement of
Genuine Disputes' that identifies the material facts that the party contends are

primarily specialty t-shirts, using silk screen printing. (DE # 21-1 at 4; Busch Aff. ¶ 2.)
Defendant has created a niche market in producing t-shirts and other promotional
materials for brewing companies and bands. (DE # 21-1 at 25; Hursey Aff. ¶ 2.)

Defendant's employees are divided between three departments: the art
department, the pre-press department, and the production department. (DE # 21-1 at
25; Hursey Aff. ¶ 3.) The art department focuses on the creation of designs for t-shirts
and other promotional items; the pre-press department focuses on the recycling of silk
screens and the preparation of silk screens prior to production; and the production
department is responsible for creating the promotional items, packaging those items,
and shipping those items. (DE # 21-1 at 25; Hursey Aff. ¶ 2.)

The number of employees that defendant employs fluctuates depending on the
season and demand for the product. (DE # 21-1 at 26; Hursey Aff. ¶ 4) Defendant's
business is usually the slowest between late winter and early spring. (DE # 21-1 at 26;
Hursey Aff. ¶ 4.) Defendant has no formal layoff or rehiring policy. (DE # 21-1 at 26;
Hursey Aff. ¶ 5.) In February of 2010, defendant moved into a larger facility. (DE # 21-1
at 4; Busch Aff. ¶ 3.) After moving to the new facility, one of defendant's co-owners

---

genuinely disputed so as to make a trial necessary." Plaintiffs' response does not have a
section labeled "Statement of Genuine Disputes," or any clear fact section at all. The
court would be within its discretion in requiring strict compliance with the local rules,
and striking defendant's response (or considering defendant's statement of facts
undisputed, as defendant requests (DE # 26 at 2-3)). *Stevo v. Frasor,* 662 F.3d 880, 886-87
(7th Cir. 2011). The court will not, however, penalize plaintiffs for their attorney's
mistake. Unfortunately, plaintiffs' response brief is scattered at times. The court will
therefore do its best to summarize the evidence presented in plaintiffs' response brief
that plaintiffs contend creates a genuine issue of material fact.

created an "Employer-Employee Relations Policy ("the policy") and required all employees to attend a meeting on February 15, 2010 to discuss the policy. (DE # 21-1 at 4; Busch Aff. ¶ 4; DE # 21-1 at 7.) Both plaintiffs signed forms indicating that they had received and read the policy. (DE # 21-1 at 80; DE # 21-1 at 101.)

The policy made clear that "verbal or physical conduct by any employee which harasses, disrupts, or interferes with another's work performance or which creates an intimidating, offensive, or hostile environment" is prohibited. (DE # 21-1 at 8.) The policy also states that any employee "who believes that another employee's words or actions constitute unwelcome harassment has a responsibility to report the situation as soon as possible." (*Id.*) Although the policy does not specify who an employee should report harassment to, neither Williamson nor Mitchell ever reported any harassment to either co-owner Marilyn Busch (DE # 21-1 at 4-6) or co-owner Iain Hursey (DE # 21-1 at 29-30.)

**Plaintiff Williamson**

Plaintiff Williamson, who is black, began his employment with defendant on September 22, 2009. (DE # 23 at 6; DE # 21-1 at 26; Hursey Aff. ¶ 7.) Williamson primarily worked as a heat press operator in the production department. (DE # 21-1 at 26-27; Hursey Aff. ¶ 7.) During his time in defendant's employ, Williamson reported to Scott Wood.[2] (DE # 21-1 at 97; Williamson Dep. 20:17-18.)

---

[2] Defendant contends that Williamson also reported to Scott Tubbs, but fails to direct the court to anything in the record to support that assertion.

Plaintiffs and defendant have differing views on why plaintiffs were terminated. Williamson alleges that he was terminated on account of his race. (DE # 1 at 7-8.) Defendant contends that Williamson was terminated because his position was eliminated. (DE # 22 at 3.) Williamson was originally hired as a heat press operator. (*Id.*; *see also* DE # 21-1 at 96; Williamson Dep. 13:1-4.) Defendant, however, almost completely stopped taking orders that required the use of a heat press in January 2010. (DE # 21-1 at 27; Hursey Aff. ¶ 9.) Because the heat press was used very little, Williamson began doing screen stretching in the pre-press department to fill his time. (DE # 21-1 at 27; Hursey Aff. ¶ 7.)

Defendant's overhead costs went up when it moved to a larger facility in February 2010. (DE # 21-1 at 27; Hursey Aff. ¶ 8.) According to defendant, in an attempt to save money, co-owner Hursey contacted production manager Scott Tubbs and manager Scott Wood, and they decided to eliminate Williamson's position due to the reduced demand for products that required the use of the heat press. (DE # 21-1 at 27; Hursey Aff. ¶ 8.) On March 17, 2010, Hursey informed Williamson that his employment was terminated.[3] (DE # 21-1 at 27; Hursey Aff. ¶ 9.)

Williamson never asked any of defendant's employees about other job openings with the company after he was terminated. (DE # 21-1 at 99; Williamson Dep. 30:7-24;

---

[3] Defendant contends that Hursey also terminated a white employee (Barbara Lauderback) from the production department that same day. (DE # 21-1 at 27; Hursey Aff. ¶ 8.) Defendant's records indicate, however, that Lauderback's employment ended several months after Williamson was terminated. (DE # 23-1 at 45.)

DE # 21-1 at 28; Hursey Aff. ¶ 11.) Co-owner Hursey provided Williamson with a letter of reference, and Williamson had no further contact with any of defendant's employees. (DE # 21-1 at 28; Hursey Aff. ¶ 9; DE # 21-1 at 91.) After Williamson was terminated, the company did not hire anyone to work solely as a heat press operator or as a screen stretcher, two jobs which Williamson had done while at the company. (DE # 21-1 at 36.) Around 2-3 hours of heat press work are now required each week, and an employee hired in June of 2012 as a part-time artist handles the heat press work. (DE # 21-1 at 27-28; Hursey Aff. ¶ 10.) Any screen stretching is done by existing employees. (DE # 21-1 at 27-28; Hursey Aff. ¶ 10.)

**Plaintiff Mitchell**

Plaintiff Mitchell, who is also black, began his employment with defendant on September 18, 2009. (DE # 23 at 6; DE # 21-1 at 28; Hursey Aff. ¶ 12.) Mitchell began in the production department, but was later moved to the pre-press department. (DE # 21-1 at 28; Hursey Aff. ¶ 12.) Mitchell initially reported to the weekday manager, Scott Tubbs, but at the time of his termination, he reported to the weekend manager, Eric Wilson. (DE # 21-1 at 28; Hursey Aff. ¶ 12.)

Like Williamson, Mitchell also alleges that he was terminated on account of his race. (DE # 1 at 7.) Defendant, however, contends that as "a press operator, Mitchell made numerous mistakes and was particularly messy, so he was moved to the pre-press department, where he prepared screens for printing by cleaning the screens and 'burning screens.'" (DE # 22 at 6; DE # 21-1 at 28; Hursey Aff. ¶ 10.) Mitchell eventually

requested to be put on the weekend shift, and was moved to that shift in August 2010. (DE # 21-1 at 28-29; Hursey Aff. ¶ 13.) While on the weekend shift, Mitchell reported to Eric Wilson, the weekend shift manager. (DE # 21-1 at 29; Hursey Aff. ¶ 13.) In this new position, Mitchell worked with Angel Pineiro, another employee on the weekend crew. (DE # 21-1 at 29; Hursey Aff. ¶ 14.)

Weekend shift manager Eric Wilson eventually reported to Hursey that both Mitchell and Pineiro had made numerous mistakes and that complaints were made about their work performance. (DE # 21-1 at 29; Hursey Aff. ¶ 14.) Specifically, Wilson reported that weekday shift workers had complained that screens were burned upside down, which caused delays in production. (DE # 21-1 at 29; Hursey Aff. ¶ 14.) After learning about these mistakes, Hursey authorized Wilson to terminate both Mitchell and Pineiro, and those two employees were terminated on September 10, 2010. (DE # 21-1 at 29; Hursey Aff. ¶ 14.) The work that Mitchell and Pineiro had done was distributed among existing employees. (DE # 21-1 at 29; Hursey Aff. ¶ 15.)

In addition to alleging that he was terminated on account of his race, Mitchell also alleges that he was subjected to a hostile work environment due to his race and his religion. This claim is based on the following incidents, most of which Mitchell did not provide a specific date for:

- While Mitchell was employed with defendant, co-worker Andrew Rowe told Mitchell that he looked like "Kunta Kinte." John Kaiser,[4] who

---

[4] In Mitchell's deposition, Mitchell testified that he reported to John Kessler while on the weekday shift, and that Kessler overheard this comment. (DE # 23-1 at 54;

Mitchell described as one of his supervisors, overheard the comment. Mitchell was not aware of Rowe being given any reprimand as a result of this incident. Mitchell did not recall when this statement was made. (DE # 21-1 at 43-44; Mitchell Dep. 40-41.)

- Prior to moving to the new building, John Kaiser showed Mitchell a picture of a raccoon, and then stated: "Coons. Get it? Coons." Mitchell understood this to be "referring to blacks being called coons." Mitchell did not report this incident to anyone else. (DE # 21-1 at 49-52; Mitchell Dep. 48:24 - 50:16.)

- Mitchell found a doll's head with a noose made out of tape around it attached to his work station. The doll's head was made to look like a co-worker who was "Caucasian and Cuban." Mitchell did not remember a precise date for this incident, and does not recall if he made a complaint to anyone regarding this incident. (DE # 21-1 at 57-59, 62-63; Mitchell Dep. 58:19-22, 59:8-15, 74:21-75:18.)

- Mitchell also reported seeing a tail that was hanging in the downstairs work area. Mitchell's co-workers would put the tail, which was made out of rope, on the backs of other co-workers. Mitchell was offended by the tail because "some people say black folks have tails." (DE # 21-1 at 58-59; Mitchell Dep. 59:17-21, 60:11-21.)

- Mitchell testified that his co-worker, Andrew Rowe, wore a t-shirt containing the words "Black Expo." Mitchell was offended by Rowe wearing this shirt because he perceived this as racism on Rowe's part. (DE # 21-1 at 60-61; Mitchell Dep. 72:15 - 73:6.)

- There were also drawings posted on the walls near his workspace that Mitchell found offensive, including a drawing of a woman flying on a hang glider defecating into the open mouth of a shark and a drawing of co-worker Andrew Rowe wearing his "Black Expo" shirt. (DE # 21-1 at 65-68; Mitchell Dep. 86:13-89:6.)

- While working on the weekend before he was fired, Mitchell found a note at his work station that read as follows:

Dear Dayv,

---

Mitchell Dep. 23:20-23.) In its statement of material facts, defendant states that Mitchell worked with a John Kaiser while on the weekday shift. (DE # 22 at 5.) Defendant's employment records only indicate that it employed a John Kaiser, and not a John Kessler. (DE # 23-1 at 44-47.) In its reply brief, defendant recognizes this discrepancy as well. (DE # 26 at 12.) Because it appears that Kessler and Kaiser are the same person - John Kaiser, the court will refer only to Kaiser moving forward.

Do wut Jon sed. That shood keep you bizzy. Even no I wurk today. Have a grate cat n nat.

Tubz

(DE # 21-1 at 82.) Mitchell believed that the note was directed at him, and written in Ebonics, which he described as a "talking in a stereotypical African-American way." Mitchell does not know who wrote the note. Mitchell used this work station on weekends, and John Kaiser used it on weekdays. (DE # 21-1 at 44-45; Mitchell Dep. 41:19 - 42:25.)

- The weekend before he was fired, Mitchell also found an image of a monkey with a hand over its mouth at his workstation. The image was a legitimate image used in a job for one of defendant's customers. Defendant reported the incident to manager Scott Tubbs, but does not know if Tubbs took any action in response to learning this information. (DE # 21-1 at 46-47; Mitchell Dep. 45:6 - 46:2; DE # 23-1 at 119.)

- Mitchell found a third item at his desk on the weekend before he was fired – a piece of paper with the phrase "I am prepared to hoist the black flag. Giving me a reason will start a storm of violence in this country not seen since 1776." A customer had requested this saying to be printed on an order of t-shirts. (DE # 21-1 at 55; Mitchell Dep. 54:3-24; DE # 21-1 at 30.) Mitchell reported seeing these three items (the note, the monkey image, and the black flag phrase) to manager Scott Tubbs. (DE # 22 at 9; DE # 21-1 at 56; Mitchell Dep. 55:6-8.)

Mitchell also alleges that he suffered harassment on account of his religion, which he stated was Egyptianology, Rastafarianism, and Orthodox Christianity. (DE # 21-1 at 47, 53, 64; Mitchell Dep. 46:6-10, 52:3-5, 76:16-21.) Mitchell testified to the following incidents regarding his religion:

- Mitchell testified that he found a pyramid made of tape on his work station. Mitchell felt this was intended to discriminate against him on the basis of his religion because his co-workers knew that he believed in Egyptianology and the pyramid was a way to antagonize him. He found the pyramid in August 2010. Mitchell did not report the pyramid to anyone. (DE # 21-1 at 47-48; Mitchell Dep. 46:3-47:18.)
- Mitchell also testified that he found an "Eye of Horus" taped to his work station in August of 2010. Mitchell described the "Eye of Horus" as "a

religious symbol . . . . Horus is a figure like Jesus." Mitchell did not report this incident to anyone. (DE # 21-1 at 48-49; Mitchell Dep. 47:19-48:23.)

- Mitchell also testified that he took offense to a poster of singer Bob Marley being posted on one of the walls at his work station, and the fact that Bob Marley music may have been played at some point at the facility. Mitchell did not complain about the Bob Marley poster to anyone. (DE # 21-1 at 52-55; Mitchell Dep. 51:17-54:2)
- Mitchell also testified that he was subjected to other incidents which resulted in a hostile work environment, but could not explain what these incidents entailed, and did not remember whether he reported them or not. (DE # 21-1 at 70; Mitchell Dep. 102:11-25.)

**Facts Relevant to Both Plaintiffs' Claims of Discriminatory Discharge**

Both plaintiffs contend that they were terminated on account of their race. This argument is primarily based on the behavior of one manager: Scott Wood. Wood, who was one of the managers consulted when making the decision to terminate Williamson, was rumored to be racist against black people. (DE # 23 at 7; DE # 23-1 at 52.) Additionally, Wood was Williamson's direct supervisor, but would not speak to or assist Williamson with any questions that he had. (DE # 23 at 8; DE # 23-1 at 9-10; Williamson Dep. 40:2-41:24.) Finally, while at a Christmas party, Williamson found Scott Wood's wallet on the ground, and when he returned it to Wood, Wood accused Williamson of trying to steal his wallet and called Williamson a "black [mother fucker]." Co-owner Iain Hursey heard Wood say this, but said nothing to Wood about his comment. (DE # 23-1 at 15-21.; Williamson Dep. 114:13-120:10.)

Williamson first filed a charge of discrimination with the EEOC on July 10, 2010, after being terminated. (DE # 22 at 11.) Williamson then filed a charge of discrimination with the EEOC for alleged retaliation in March 2011. (DE # 1 at 1; DE # 22 at 11.)

9

Mitchell filed a charge of discrimination with the EEOC in October of 2010. (DE # 22 at 11.) Plaintiffs were issued right to sue letters from the EEOC on June 15, 2011. (*Id.*) Defendant has now moved for summary judgment on plaintiffs' claims.

## II.    Legal Standard

FEDERAL RULE OF CIVIL PROCEDURE 56 requires the entry of summary judgment, after adequate time for discovery, against a party "who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986). "[S]ummary judgment is appropriate–in fact, is mandated–where there are no disputed issues of material fact and the movant must prevail as a matter of law. In other words, the record must reveal that no reasonable jury could find for the non-moving party." *Dempsey v. Atchison, Topeka, & Santa Fe Ry. Co.,* 16 F.3d 832, 836 (7th Cir. 1994) (citations and quotation marks omitted).

The moving party bears the initial burden of demonstrating that these requirements have been met; it may discharge this responsibility by showing that there is an absence of evidence to support the non-moving party's case. *Carmichael v. Village of Palatine, Ill.,* 605 F.3d 451, 460 (7th Cir. 2010) (citing *Celotex,* 477 U.S. at 323). To overcome a motion for summary judgment, the non-moving party must come forward with specific facts demonstrating that there is a genuine issue for trial. *Id.* (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)). The existence of a mere scintilla of evidence, however, is insufficient to fulfill this requirement. *Id.* (citing *Anderson v. Liberty Lobby, Inc.,*

477 U.S. 242, 251-52 (1986)). The nonmoving party must show that there is evidence upon which a jury reasonably could find for him. *Id.*

The court's role in deciding a summary judgment motion is not to evaluate the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson,* 477 U.S. at 249-50; *Doe v. R.R. Donnelley & Sons Co.,* 42 F.3d 439, 443 (7th Cir. 1994). On summary judgment a court may not make credibility determinations, weigh the evidence, or decide which inferences to draw from the facts; these are jobs for a factfinder. *Payne v. Pauley,* 337 F.3d 767, 770 (7th Cir. 2003) (citing *Anderson,* 477 U.S. at 255). In viewing the facts presented on a motion for summary judgment, the court must construe all facts in a light most favorable to the non-moving party and draw all reasonable inferences in favor of that party. *Chmiel v. JC Penney Life Ins. Co.,* 158 F.3d 966, 968 (7th Cir. 1998); *Doe,* 42 F.3d at 443. Importantly, the court is "not required to draw *every* conceivable inference from the record [in favor of the non-movant]-only those inferences that are reasonable." *Bank Leumi Le-Israel, B.M., v. Lee,* 928 F.2d 232, 236 (7th Cir. 1991) (emphasis added).

III.    **Analysis**

    **A. Williamson**

        **I. Discriminatory Discharge**

In plaintiffs' complaint, Williamson alleges that he was terminated because he is black. (DE # 1 at 5.) Title VII forbids an employer "to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to [the

individual's] compensation, terms, conditions, or privileges of employment, because of such individual's race . . . or national origin." 42 U.S.C. § 2000e-2(a)(a). A plaintiff may prove employment discrimination under Title VII using either the "direct method" or the "indirect method." *See, e.g., Cerruti v. BASF Corp.,* 349 F.3d 1055, 1060-61 (7th Cir. 2003). Under the direct method of proof, a plaintiff must show through the preponderance of direct and/or circumstantial evidence that the employer's decision to take an adverse job action against the plaintiff was motivated by an unlawful purpose, such as race or national origin. *Id.* at 1061. The indirect method provides a burden-shifting framework in which a plaintiff who establishes a prima facie case enjoys a presumption of discrimination which requires the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 (1973).

Williamson's response brief does not indicate whether he is proceeding under the direct or indirect method. The court will therefore analyze his claim under both, beginning with the direct method. The direct method of proof utilizes both direct and circumstantial evidence that goes straight to the issue of intent. Direct evidence of discrimination is, essentially, an acknowledgment of discriminatory intent by the defendant or its agents, without reliance on inference or presumption. *Robin v. Espo Eng'g Corp.*, 200 F.3d 1081, 1088 (7th Cir. 2000); *see also Gorence v. Eagle Food Ctrs., Inc.,* 242 F.3d 759, 762 (7th Cir. 2001); *Mojica v. Gannett Co.*, 7 F.3d 552, 561 (7th Cir. 1993). By way of example, the statement "I fired Judy because she was an old woman" proves intentional discrimination against Judy based on her age; thus it is direct evidence. *Gorence*, 242 F.3d at 762. In contrast, the

statement "Old women are hard to deal with," without more, does not prove intentional discrimination against Judy based on her age, and thus it is circumstantial evidence. *Id.*; *see also Rogers v. City of Chi.*, 320 F.3d 748, 753 (7th Cir. 2003) ("Direct evidence essentially requires an admission by the decision-maker that his actions were based upon the prohibited animus.") (citation and internal quotation marks omitted). A plaintiff can survive summary judgment by producing either type of evidence as long as it creates a triable issue on whether discrimination motivated the employment action. *Diaz v. Kraft Foods Global, Inc.*, 653 F.3d 582, 587 (7th Cir. 2011).

With regard to his termination, Williamson argues that he and Mitchell have "produced direct proof that [Iain Hursey, Scott Wood, and Scott Tubbs] violated Title VII and rendered [defendant] vicariously liable for their conduct." (DE # 23 at 12.) "Direct evidence requires an admission of discriminatory intent, i.e., 'smoking-gun' evidence." *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979 (7th Cir. 2014). Plaintiff Williamson has not, however, directed the court to any "smoking-gun" evidence regarding his termination. "A plaintiff may survive a motion for summary judgment based only on circumstantial evidence under the direct method, but only if the circumstantial evidence presented points directly to a discriminatory reason for the employer's action." *Good v. Univ. of Chi. Med. Ctr.*, 673 F.3d 670, 675 (7th Cir. 2012) (citation and quotation omitted). Plaintiff Williamson points to four pieces of circumstantial evidence which he contends establish that defendant's decision to fire him "was motivated by an unlawful purpose[.]" *Cerruti,* 349 F.3d at 1061.

First, Williamson argues that Wood "was a manager who would not talk to or assist Black employees that he supervised." (DE # 23 at 13.) The evidence that plaintiffs cite for this proposition is Williamson's deposition testimony that Wood would not assist Williamson with any questions he had regarding work. (DE # 23-1 at 9; Williamson Dep. 40:2-41:24.) Next, plaintiffs point out that Wood was "rumored to have previously been fired for using the word 'nigger' on the job[.]"(DE # 23 at 13.) Plaintiffs also assert that both plaintiffs believed that Wood did not like black people. (*Id.*) Finally, plaintiffs point to the incident where plaintiff Williamson found Wood's wallet at a holiday Christmas party and Wood accused Williamson of trying to steal his wallet. (*Id.*) This is the incident in which Wood called Williamson a "black mother fucker."(DE # 23-1 at 15-21.; Williamson Dep. 114:13-120:10.)

Defendant argues that Wood's "black mother fucker" comment was a "stray remark" that was too far removed from plaintiff Williamson's termination to be relevant. (DE # 26 at 6.) "Although stray remarks are generally insufficient to establish discriminatory motivation, an exception may be made where the remark was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan v. Cook Cnty. Sheriff's Dep't,* 602 F.3d 845, 850 (7th Cir. 2010). Although defendant does not dispute that Wood participated in making the decision to fire Williamson, this comment had nothing to do with Williamson's termination, and

presumably,[5] was made approximately three months before Williamson was terminated in March of 2010. Therefore, Wood's comment, while abhorrent, is not sufficient to create a reasonable inference of discrimination. *Petts v. Rockledge Furniture LLC,* 534 F.3d 715, 722 (7th Cir. 2008) ("We have concluded that comments made three and even two months before the challenged employment action fail to create a reasonable inference of discrimination.").

Defendant also argues that plaintiffs' belief that Wood was racist, including Wood's refusal to help Williamson, is insufficient to create an issue of material fact. (DE # 26 at 6.) The court agrees. "If the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." *Yancick v. Hanna Steel Corp.,* 653 F.3d 532, 548 (7th Cir. 2011) (citation and quotation omitted). Plaintiffs have failed to provide any evidence, other than their own personal beliefs, that Wood's refusal to work with Williamson was due to Williamson's race. This too, therefore, is insufficient to create a reasonable inference of discrimination.

Plaintiffs also point to rumors that Wood was a racist and was fired from a previous job for using the word "nigger."(DE # 23 at 13.) A plaintiff, however, "cannot thwart summary judgment by asking a court to make inferences based on flights of fancy,

---

[5] The parties have not directed the court to a specific date on which the statement was made. The statement was made at a Christmas party, however, and the court will therefore assume it was made sometime in December of 2009, the only December that Williamson was employed by defendant.

speculations as to the defendant's state of mind, hunches, intuitions or rumors about matters remote from that experience." *Kodish v. Oakbrook Terrace Fire Protection District,* 604 F.3d 490, 507-08 (7th Cir. 2010). These rumors are insufficient to create a reasonable inference of discrimination. *McDonald v. Vill. of Winnetka,* 371 F.3d 992, 1001 (7th Cir. 2004) ("Inferences that are supported by only speculation or conjecture will not defeat a summary judgment motion.").

Because Williamson has failed to offer evidence that creates a reasonable inference of discrimination, his claim cannot proceed under the direct method. The court will therefore move on to the indirect method analysis.

Using the indirect, or "burden-shifting," method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802 . To establish a prima facie case of discrimination, a plaintiff must offer evidence that: (1) he is a member of a protected class; (2) his job performance was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably.[6] *Coleman v. Donahoe,* 667 F.3d 835, 845 (7th Cir. 2012). Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the employer does so, then the

---

[6] The fourth element is actually not quite so clear. The court will discuss this issue in more detail below.

burden shifts back to the plaintiff to offer evidence suggesting that the offered explanation is a pretext for discrimination. *Id.*

Defendant's only argument with regard to Williamson's initial prima facie burden under the indirect method appears to be that Williamson cannot meet element (4) – that another similarly situated individual who was not in the protected class was treated more favorably than Williamson. (DE # 22 at 15.) Defendant contends that Williamson's position was eliminated due to a reduction in force. (DE # 22 at 14-15.) In a traditional reduction in force case, which applies when an employee's position is eliminated completely, the fourth element of the indirect method is that a similarly situated employee outside of the plaintiff's protected class was treated more favorably. *Merillat v. Metal Spinners, Inc.*, 470 F.3d 685, 689 (7th Cir. 2006); *see also Reyno v. PNB Remittance Centers, Inc.*, No. 09 C 4446, 2011 WL 3021300, at *5 (N.D. Ill. July 22, 2011); *Steeno v. Wabash Nat. Trailer Centers*, 822 F. Supp. 2d 855, 861 (N.D. Ind. 2011) In a "mini" reduction in force case, which applies when a terminated employee's duties are absorbed by other existing staff, the fourth element is that the terminated employee's duties were absorbed by someone outside of the protected class. *Merillat*, 470 F.3d at 690-91; *Steeno*, 822 F. Supp. 2d at 861.

Defendant contends that this is a traditional, and not a "mini" reduction in force case because it "eliminated the heat press operator position altogether, rather than dispersing the duties of the full-time position among other employees." (DE # 22 at 14.) Defendant's co-owner, Iain Hursey, testified in an affidavit that the jobs that Williamson had done – heat press and screen stretching in the production department – no longer needed a full-

time employee to perform those tasks. (DE # 21-1 at 26-28; Hursey Aff. ¶¶ 7, 9-10.) Hursey testified that defendant stopped printing jerseys in January of 2010, which significantly reduced the amount of work needed to be completed using the heat press. (DE # 21-1 at 26-27; Hursey Aff. ¶¶ 7, 9.) But the heat press and screen stretching work was still done after Williamson's termination. Hursey testified that other employees continued to work the heat press and do screen stretching when those tasks needed to be done. (DE # 21-1 at 27-28; Hursey Aff. ¶ 10.)

The pertinent question regarding whether the traditional reduction in force or the "mini" reduction in force applies in this case is "whether [defendant] still needed [Williamson's] job responsibilities to be performed." *Michas v. Health Cost Controls of Illinois, Inc.,* 209 F.3d 687, 693-94 (7th Cir. 2000); *see also Paluck v. Gooding Rubber Co.,* 221 F.3d 1003, 1011 n. 5 (7th Cir. 2000) ("When a terminated employee's duties were absorbed by other employees, rather than eliminated from the company altogether, we do not require the former employee plaintiff to make out the prima facie case normally required for reduction in force cases."). Here, although Williamson's duties were scaled back after he left, the undisputed evidence shows that other employees still performed those tasks. Thus, defendant still needed Williamson's job responsibilities to be performed. *Michas,* 209 F.3d at 693-94. Therefore, the court concludes that this case is properly designated a "mini" reduction in force case, and the fourth element of the indirect method is that the terminated employee's duties were absorbed by someone outside of the protected class.

Because defendant failed to correctly identify the fourth element in this analysis, neither defendant nor Williamson analyzed whether Williamson's duties were assumed by employees outside of the protected class. Hursey's affidavit, however, reveals that any future heat press work was done by a white male employee, Chris Kirk. (DE # 21-1 at 27-28; Hursey Aff. ¶ 10.) Additionally, Williamson points out in his response brief that defendant hired a white male, Charles McAfee, to do pre production work that Williamson had done before he was terminated. (DE # 23-1 at 45.) Due to the fact that neither party addressed this issue, the court concludes that this evidence is sufficient to raise a question of material fact on whether Williamson's duties were absorbed by employees outside of the protected class.

Because defendant makes no other argument regarding the four elements of Williamson's prima facie case under the indirect method, the burden shifts to defendant to come forward with a legitimate, non-discriminatory reason for its actions. *Donahoe,* 667 F.3d at 845. In this case, defendant asserts that it terminated Williamson's employment for financial reasons: the company's overhead costs had recently gone up due to the move to the larger building, and orders for the heat press, the operation of which was Williamson's primary duty, had diminished significantly. (DE # 22 at 16.) This is a sufficient articulation of a legitimate, non-discriminatory rationale for firing Williamson.

This leaves plaintiff at the last phase of the *McDonnell Douglas* analysis: the pretext phase. At this point, the court must examine the pertinent issue of whether there was discrimination in the job action. *Johnson v. Nordstrom, Inc.,* 260 F.3d 727, 732 (7th Cir. 2001).

"To demonstrate pretext, a plaintiff must show more than that the employer's decision was incorrect; the plaintiff must also show the employer lied about its proffered explanation." *Id.* (citations and quotations omitted). Thus, the focus of the pretext inquiry is whether the proffered reason for the employment decision is a lie. *O'Leary v. Accretive Health, Inc.,* 657 F.3d 625, 635 (7th Cir. 2011). In this case, Williamson attempts to show that defendant's explanation for his termination was pretextual by pointing out that defendant was hiring new employees at a rapid pace around the time that he was terminated. (DE # 23 at 10.) Williamson directs the court to evidence that within three months of his termination, defendant had hired ten additional employees, seven of which were hired to handle duties that Williamson had handled before his termination. (*Id.*; DE # 23-1 at 44-46.)

The undisputed evidence shows that in addition to working as a heat press operator, Williamson also performed screen stretching in the pre-production department. (DE # 21-1 at 27; Hursey Aff. ¶ 9) Additionally, Williamson testified that he performed some shipping and receiving duties, and some pre press duties, including cleaning screens. (DE # 23-1 at 2; *see also* Williamson Dep. 13:5-22.) Within just a few weeks of Williamson's termination, defendant hired two employees to perform catching and packaging duties (Amanda Montgomery and Mariah Jones) and two employees in the pre press department to clean screens (Charles McAfee and Tony Pattengale). (DE # 23-1 at 45-46.) In the three months following Williamson's termination, defendant hired additional employees to handle shipping duties and do screen cleaning. (*Id.*)

Although it is possible that a reasonable jury could find that defendant's decision to terminate Williamson's employment was purely financial, a reasonable jury could also conclude that the decision was made due to Williamson's race and not financial reasons, in light of all of the hiring that defendant was doing immediately following Williamson's termination. *Hasan v. Foley & Lardner LLP,* 552 F.3d 520, 531 (7th Cir. 2008) ("Similarly, it is unclear from the record why Foley hired new associates into its Business Law Department immediately after firing Mr. Hasan. It is possible that the firm lacked work for midlevel associates with Mr. Hasan's skill set and instead needed attorneys with different experience or training. A jury could also conclude, however, that the Business Law Department hired new associates because it actually had plenty of work."). Williamson has provided enough evidence to allow a reasonable jury to conclude that defendant's proffered reason for terminating Williamson's employment was a lie. *O'Leary,* 657 F.3d at 635. Defendant's motion for summary judgment will therefore be denied on plaintiff's employment discrimination claim.

### ii. Retaliation

Williamson also contends that defendant violated Title VII by failing to consider rehiring him because he filed a charge of discrimination with the EEOC. (DE # 23 at 5.) Under Title VII's anti-retaliation provision, it is unlawful for an employer to "discriminate against" an employee "because he has opposed any practice made an unlawful employment practice" by the statute or "because he has made a charge, testified, assisted, or participated in" a Title VII "investigation, proceeding, or hearing." 42 U.S.C.

§ 2000e-3(a). Like a discrimination claim, a retaliation claim can be established through either the direct or indirect method. *Jajeh v. County of Cook*, 678 F.3d 560, 569 (7th Cir. 2012). To satisfy the direct method of proof, plaintiff must show that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action at the hands of the defendant; and (3) there was a causal link between the protected activity and the adverse employment action. *Id.*

A plaintiff may also attempt to prove his retaliation claim under the indirect method. In a failure-to-hire situation, the *prima facie* case which must be established by the plaintiff in the first phase of the indirect method of proof is modified slightly from the normal formulation. In order to survive the *prima facie* stage, the unhired plaintiff must demonstrate that: (1) he engaged in a statutorily protected activity; (2) he applied and had the qualifications required for the position; 3) he was not hired for the position; and 4) a similarly situated individual who did not engage in the protected activity was hired for the position. *Cichon v. Exelon Gen. Co., L.L.C.*, 401 F.3d 803, 812 (7th Cir. 2005).

Defendant argues that it is entitled to summary judgment because Williamson never applied or inquired about any open positions after he was terminated, and therefore, cannot show he suffered an adverse employment action. (DE # 22 at 16-17.) Williamson does not respond to this argument in his response brief, and therefore, has not provided any argument or evidence in response to defendant's argument on this issue. It is undisputed, however, that Williamson never applied for any open positions or contacted

any of defendant's employees to inquire about any openings after being terminated. (DE # 21-1 at 99; DE # 21-1 at 28; Hursey Affidavit ¶ 11.)

Williamson's failure to apply for the open positions, express interest in the open positions, or contact defendant or its employees about open positions dooms his retaliation claim under the direct and indirect method. "Whether the plaintiff proceeds by the direct or indirect method of proof, he must show a materially adverse employment action." *Rhodes v. Ill. Dep't of Transp.,* 359 F.3d 498, 504 (7th Cir. 2004). "To proceed on a refusal-to-hire claim, a plaintiff must at a minimum establish that she suffered some adverse employment action, namely, that [he] was passed over for a job." *Wilson v. Cook County*, 742 F.3d 775, 784 (7th Cir. 2014). Williamson, however, has not directed the court to any evidence that he in any way let defendant know he was interested in being rehired. *Sembos v. Philips Components*, 376 F.3d 696, 702 (7th Cir. 2004) ("An employer cannot be liable for failing to hire a person who does not apply for a job."); *Ritter v. Hill 'N Dale Farm, Inc.,* 231 F.3d 1039, 1045 (7th Cir. 2000) ("Having not applied for the position, [plaintiff] cannot demonstrate a prima facie case of discrimination due to [defendant's] failure to hire him as a mechanic."); *Konowitz v. Schnadig Corp.,* 965 F.2d 230, 234 (7th Cir. 1992) (defendant's failure to consider the plaintiff for other openings after a reduction in force "does not lead to an inference of discrimination, since nothing in the record suggests that he applied for any jobs or informed the company of his interest"); *see also Gaines v. White River Envtl. P'ship,* 66 F. App'x 37, 39 (7th Cir. 2003) ("To establish that [defendant's] failure to promote

him amounted to an adverse employment action, [plaintiff] must demonstrate that he applied for the promotion.").[7]

Williamson's only response to defendant's motion for summary judgment on this issue is directing the court to the EEOC's determination that defendant violated Title VII by not recalling Williamson to work due to Williamson filing a charge of discrimination. (DE # 23-1 at 114.) This determination is based on a statement by defendant's co-owner Iain Hursey to an EEOC investigator that he (Hursey) had been willing to hire Williamson back until he filed his charge of discrimination.[8] (DE # 23-1 at 48.) The Seventh Circuit has made clear that district courts have "great discretion" in the treatment of EEOC determinations. *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 732 (7th Cir. 2011). Even when considering this evidence, however, it does not create an issue of fact on Williamson's retaliation claim. He still fails to show that he suffered an adverse employment action; Williamson never applied for any positions or expressed his interest in any positions after he was terminated. Thus, defendant was never given an opportunity to retaliate against Williamson. Defendant is therefore entitled to summary judgment on Williamson's retaliation claim.

---

[7] Additionally, there is no indication that defendant had a practice of rehiring previously terminated employees. (DE # 23-1 at 44-47.) Furthermore, Williamson did not file his charge of discrimination until July 10, 2010, and the record reveals that defendant only hired a handful of employees on or after that date. (*Id.*.)

[8] Defendant has moved to strike this evidence (DE # 24), and plaintiffs have not responded to the motion. The court will address this motion later in the opinion.

### B. Mitchell

#### i. Discriminatory Discharge

Plaintiff Mitchell contends that his employment with defendant was terminated because of his race. As noted above, a plaintiff may prove employment discrimination under Title VII using either the "direct method" or the "indirect method." *See, e.g., Cerruti,* 349 F.3d at 1060-61. It is not clear from plaintiffs' response brief whether Mitchell is proceeding under the direct or indirect method. The court will therefore analyze Mitchell's claim under the direct method first, before moving on to the indirect method.

Under the direct method of proof, a plaintiff must show through the preponderance of direct and/or circumstantial evidence that the employer's decision to take an adverse job action against the plaintiff was motivated by an unlawful purpose, such as race or national origin. *Id.* at 1061; *see also Naficy v. Ill. Dep't of Human Servs. .,* 697 F.3d 504, 509 (7th Cir. 2012) ("To avoid summary judgment using the 'direct method,' a plaintiff must marshal sufficient evidence, either direct or circumstantial, that an adverse employment action was motivated by discriminatory animus.").

With regard to his termination, Mitchell argues that he and Williamson have "produced direct proof that [Iain Hursey, Scott Wood, and Scott Tubbs] violated Title VII and rendered [defendant] vicariously liable for their conduct." (DE # 23 at 12.) First, Mitchell argues that Scott Wood, who Mitchell contends managed him at the time of his firing, caused Mitchell's termination "because he did not like Black people, and [because] Mitchell complained to Woods about company racism two days before his firing." (DE # 23

at 7.) Plaintiffs' contention that Wood did not like black people is based on several pieces of evidence that plaintiffs set out in their response brief. The court summarized this evidence when addressing Williamson's claims:

> First, Williamson argues that Wood "was a manager who would not talk to or assist Black employees that he supervised." (DE # 23 at 13.) The evidence that plaintiffs cite for this proposition is Williamson's deposition testimony that Wood would not assist Williamson with any questions he had regarding work. (DE # 23-1 at 9; Williamson Dep. 40:2-41:24.) Next, plaintiffs point out that Wood was "rumored to have previously been fired for using the word 'nigger' on the job[.]"(DE # 23 at 13.) Plaintiffs also assert that both plaintiffs believed that Wood did not like black people. (*Id.*) Finally, plaintiffs point to the incident where plaintiff Williamson found Wood's wallet at a holiday Christmas party Wood accused Williamson of trying to steal his wallet. (*Id.*) This is the incident in which Wood called Williamson a "black mother fucker."(DE # 23-1 at 15-21.; Williamson Dep. 114:13-120:10.)

*See supra* p. 14.

Defendant argues that Wood's "black mother fucker" comment was a "stray remark" that was too far removed from Mitchell's termination to be relevant. (DE # 26 at 6.) "Although stray remarks are generally insufficient to establish discriminatory motivation, an exception may be made where the remark was (1) made by the decisionmaker, (2) around the time of the decision, and (3) in reference to the adverse employment action." *Egonmwan,* 602 F.3d at 850. Wood's comment had nothing to do with Mitchell's termination, and presumably,[9] was made approximately nine months before Mitchell was terminated in September of 2010. Therefore, as the court noted

---

[9] As noted earlier (*see supra* n. 5), the parties have not directed the court to a specific date on which the statement was made. The statement was made at a Christmas party, however, and the court will therefore assume it was made sometime in December of 2009, the only December that Mitchell was employed by defendant.

earlier, Wood's comment, while abhorrent, is not sufficient to create a reasonable inference of discrimination. *Petts,* 534 F.3d at 722 ("We have concluded that comments made three and even two months before the challenged employment action fail to create a reasonable inference of discrimination.")

Much of Mitchell's evidence is the same evidence Williamson relied on to support his claim of discrimination: plaintiffs' beliefs that Wood was racist, rumors that Wood was racist, and rumors that Wood was fired from a previous job for using the word "nigger." The court explained above (*see supra* pp. 15-16) why this evidence fails to create a reasonable inference of discrimination, and the same analysis applies here.

Mitchell also argues that Wood caused Mitchell's termination because Mitchell complained to Wood about racism at the company two days before he was fired. (DE # 23 at 7; DE # 23-1 at 73; Mitchell Dep. 64:6-11.) Although this may be better categorized as a separate retaliation claim, the fact that Mitchell complained to Wood about racism two days before he was fired is still insufficient to raise a genuine issue of material fact because there is no evidence that Wood was the decision maker behind Mitchell's termination or was even consulted about whether Mitchell should be terminated.[10] In his affidavit, defendant's co-owner Iain Hursey stated that he made the

---

[10] In his response brief, Mitchell contends that Wood was his manager at the time of his firing, but does not support this claim with citation to the record. (DE # 23 at 7.) In his deposition, Mitchell testified that he believed that Wood had caused his termination. (DE # 23-1 at 89-91; Mitchell Dep. 154:25-156:-21.) Mitchell, however, failed to testify how he came to this belief or provide any other evidence that Wood was actually involved in his termination. This alone is insufficient to defeat summary judgment. *Chiaramonte v. Fashion Bed Group, Inc.,* 129 F.3d 391, 401 (7th Cir. 1997) ("[I]f

decision to terminate Mitchell's employment after consulting with weekend manager Eric Wilson.[11] (DE # 21-1 at 29; Hursey Aff. ¶ 14.)

Mitchell has failed to direct the court to any evidence that Wood had any input into the decision to terminate his employment. Furthermore, Mitchell has failed to direct the court to any evidence that either Hursey or Wilson knew that Mitchell had complained to Wood about racism two days before his employment was terminated. In sum, Mitchell has failed to offer evidence that creates a reasonable inference of discrimination, and Mitchell cannot proceed past summary judgment using the direct method.[12]

---

the subjective beliefs of plaintiffs in employment discrimination cases could, by themselves, create genuine issues of material fact, then virtually all defense motions for summary judgment in such cases would be doomed." (citation and quotation omitted). Additionally, at another point in his deposition, Mitchell testified that he did not report to Wood, and did not know whether Wood was involved in the decision to terminate his employment. (DE # 23-1 at 75; Mitchell Dep. 80:9-22.)

[11] Because neither party addresses this as a separate retaliation claim, the court will not go into a retaliation analysis. But even if the court were to do a separate retaliation analysis, it is unlikely that Mitchell's claim would survive summary judgment, as he has failed to direct the court to evidence that either Wilson or Hursey knew about his complaints to Wood. *Stephens v. Erickson*, 569 F.3d 779, 788 (7th Cir. 2009) ("Clearly, a superior cannot retaliate against an employee for a protected activity about which he has no knowledge.").

[12] Although Mitchell does not argue this point in his response brief, it also appears that Mitchell told weekday production manager Scott Tubbs about the items left on his desk the weekend before he was fired. (DE # 21-1 at 56; Mitchell Dep. 55:6-8.) Mitchell, however, does not direct the court to any evidence that Tubbs was involved in his termination or that either Wilson or Hursey knew about his complaint to Tubbs. *Erickson*, 569 F.3d at 788.

Using the indirect, or "burden-shifting," method, the plaintiff carries "the initial burden under the statute of establishing a prima facie case of . . . discrimination." *McDonnell Douglas Corp.,* 411 U.S. at 802. To establish a prima facie case of discrimination, a plaintiff must offer evidence that: (1) he is a member of a protected class; (2) his job performance was meeting the employer's legitimate expectations; (3) he suffered an adverse employment action; and (4) another similarly situated individual who was not in the protected class was treated more favorably. *Donahoe,* 667 F.3d at 845. Once such a showing is made, the burden shifts to the employer to articulate a legitimate, non-discriminatory reason for its actions. *Id.* If the employer does so, then the burden shifts back to the plaintiff to offer evidence suggesting that the offered explanation is a pretext for discrimination. *Id.*

Defendant argues that it is entitled to summary judgment under the indirect method because the undisputed evidence shows that Mitchell was not meeting defendant's legitimate expectations. (DE # 22 at 18.) Defendant also argues that Mitchell cannot show pretext. (*Id.*) "In cases like this, where the question whether the employee was meeting the company's legitimate expectations merges with the question whether the company's reasons for the discharge are honest, we focus on the issue of pretext." *Fore v. Lakeside Buses of Wisconsin, Inc.,* 392 F. App'x 478, 479-80 (7th Cir. 2010); *see also Senske v. Sybase, Inc.,* 588 F.3d 501, 506-07 (7th Cir. 2009) (same).

As noted earlier, the focus of the pretext inquiry is whether the proffered reason for the adverse employment action is a lie. *O'Leary,* 657 F.3d at 635. Defendant's

proffered reason for terminating Mitchell's employment was that Mitchell was "performing poorly, making numerous errors which were causing delays for the weekday production department." (DE # 22 at 18; DE # 21-1 at 29; Hursey Aff. ¶ 14.) In response, Mitchell argues that "defendant has not produced a shred of written evidence kept in the ordinary course of business that would corroborate [defendant's assertion that Mitchell was performing poorly]." (DE # 23 at 11.) Mitchell also points out that defendant's Employer-Employee Relations Policy Manual states that defendant endorses a policy of progressive discipline that gives employees notice of deficiencies and opportunities to improve. (*Id.*; DE # 23-1 at 96.)

Defendant has supported its argument that Mitchell was performing poorly with admissible evidence. (DE # 22 at 18; DE # 21-1 at 29; Hursey Aff. ¶ 14.) "An employee may demonstrate that the employer's reasons are unworthy of credence through evidence showing (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate his discharge, *or* (3) that they were insufficient to motivate discharge." *Silverman v. Board of Educ. of City of Chicago*, 637 F.3d 729, 738 (7th Cir. 2011). Mitchell has not done that here. Instead of directing the court to evidence that defendant's reason for terminating his employment was "unworthy of credence," Mitchell argues that defendant did not follow the procedures set out in its employee handbook. (DE # 22 at 15.) This argument is unpersuasive.

In *Hague v. Thompson Distribution Co.*, the plaintiffs attempted to establish pretext on their race discrimination claim by pointing out that defendant had failed to follow

the progressive discipline policy set out in the company handbook. 436 F.3d 816, 828 (7th Cir. 2006). Although the policy did call for a progressive disciplinary structure, it also allowed the defendant to fire its employees immediately. *Id.* The Seventh Circuit concluded that because the defendant's policy allowed it to fire its employees immediately, the defendant did not violate its own policy, and the defendant's failure to use progressive discipline did not constitute evidence of pretext. *Id.*

In this case, Mitchell correctly points out that defendant's employee manual "endorses a policy of progressive discipline in which it attempts to provide employees with notice of deficiencies and an opportunity to improve." (DE # 23-1 at 96.) The manual goes on to state, however, that defendant "retain[s] the right to administer discipline in any manner it sees fit." (*Id.*) Thus, like the defendant in *Hague*, defendant's failure to use progressive discipline in Mitchell's case did not violate its own policy, and is therefore not evidence of pretext.

Mitchell has offered no other evidence of pretext. His claim therefore cannot proceed under the indirect method, and defendant is entitled to summary judgment on Mitchell's discriminatory discharge claim.

### ii. Hostile Work Environment

Mitchell also claims that he was subjected to a hostile work environment, claiming that he was harassed based on his race and his religion. Title VII is violated "when the workplace is permeated with discriminatory intimidation, ridicule, and insult . . . that is sufficiently severe or pervasive to alter the conditions of the victim's

employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.,* 510 U.S. 17, 21 (1993) (citations and quotations omitted). "To avoid summary judgment on a hostile work environment claim, a plaintiff must provide sufficient evidence to create a genuine issue of material fact as to four elements: (1) the work environment must have been both subjectively and objectively offensive; (2) [his race or religion] must have been the cause of the harassment; (3) the conduct must have been severe or pervasive; and (4) there must be a basis for employer liability." *Chaib v. Indiana*, 744 F.3d 974, 985 (7th Cir. 2014). In its motion for summary judgment, defendant argues that Mitchell fails to present evidence sufficient to create a genuine issue of material fact on elements (1) and (4). (DE # 22 at 19, 24.) The court need only address the fourth element - employer liability - to resolve defendant's motion.

Defendant argues that Mitchell's hostile work environment claim fails because Mitchell "never reported any of the alleged harassing incidents[,]" and therefore, argues there is no basis for employer liability. (DE # 22 at 24.) Mitchell does not directly respond to this argument in his response brief.

"Whether there is a basis for employer liability depends on whether the alleged harassment was perpetrated by a supervisor or a coworker." *Jajeh v. County of Cook*, 678 F.3d 560, 568 (7th Cir. 2012). "An employer may be strictly liable for harassment by supervisors, but a negligence standard applies for harassment by coworkers." *Id.* Thus, in order to establish liability on a hostile work environment claim, a plaintiff must establish either "(1) that a supervisor participated in the harassment that created the

32

hostile work environment or (2) that [the employer] was negligent in discovering or remedying harassment by his coworkers." *Montgomery v. American Airlines, Inc.,* 626 F.3d 382, 390 (7th Cir. 2010). The Supreme Court recently determined that an employee is a supervisor "for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions against the victim." *Vance v. Ball State Univ.,* –––U.S. ––––, 133 S. Ct. 2434, 2454 (2013). The court will first address whether Mitchell has presented evidence that the alleged harassment he was subjected to was caused by a supervisor.

a. **Supervisor Participation**

In this case, Mitchell has provided evidence of several instances of racial and religious harassment by defendant's employees. Mitchell, however, was only able to identify the person behind the harassment for some of these incidents. Mitchell has not identified the employee (or employees) he believes was involved in the following incidents: the doll's head with the noose made out of tape around it (DE # 21-1 at 58-59, 62-63; Mitchell Dep. 58:19-22, 59:8-15, 74:21-75:18); the tail made out of rope that employees would pin on their co-workers' backs (DE # 21-1 at 58-59; Mitchell Dep. 59:17-21, 60:11-21); the pyramid found at his work station (DE # 21-1 at 47-48; Mitchell Dep. 46:3-47:18); the "Eye of Horus" at his work station (DE # 21-1 at 48-49; Mitchell Dep. 47:19-48:23); the drawings posted near his workspace of the woman defecating into the shark's mouth and of co-worker Andrew Rowe wearing his Black Expo shirt

(DE # 21-1 at 65-68; Mitchell Dep. 86:13-89:6); and the Bob Marley poster and music (DE # 21-1 at 52-55; Mitchell Dep. 51:17-54:2).

There is no evidence that a supervisor was involved in these incidents, and it is not reasonable to infer that a supervisor was behind this conduct when there is no evidence indicating that to be the case. *See Hrobowski v. Worthington Steel Co.,* 358 F.3d 473, 478 (7th Cir. 2004) (no issue of material fact as to whether supervisor contributed to hostile work environment when there was no evidence that a "particular person" with the power to change the terms and conditions of the plaintiff's employment was involved with the harassment); *see also Wright v. Porters Restoration, Inc.,* Cause No. 2:09–CV–163, 2010 WL 5184891, at *4 (N.D. Ind. Dec. 13, 2010). The court will therefore focus on the incidents that Mitchell was able to associate with a particular co-worker.

First, co-worker Andrew Rowe called Mitchell "Kunta Kinte," which is, presumably, a reference to the lead character in the 1977 TV Miniseries "Roots." Mitchell testified that John Kaiser observed this incident, but did nothing in response to seeing it. (DE # 21-1 at 43-44; Mitchell Dep. 40-41.) There is no dispute that Rowe was Mitchell's co-worker.[13]

Mitchell also testified about another incident involving Kaiser. Prior to moving to the new building, Kaiser showed Mitchell a picture of a raccoon, and then stated: "Coons. Get it? Coons." Mitchell understood this to be "referring to blacks being called

---

[13] Mitchell also testified that there was another incident involving Rowe that he found offensive - Rowe wore a "Black Expo" shirt to work. (DE # 21-1 at 60-61; Mitchell Dep. 72:15 - 73:6.)

coons." Mitchell did not testify that Kaiser called him a "coon" directly, and did not report this incident to anyone else. (DE # 21-1 at 49-52; Mitchell Dep. 48:24 - 54:16.)

Mitchell referred to Kaiser as a supervisor in his deposition and in his response brief. (DE # 21-1 at 43-44; Mitchell Dep. 40-41; DE # 22 at 8.) Mitchell has failed to direct the court to any evidence, however, that Kaiser had authority to take any tangible employment actions against him, and the evidence the court has before it indicates the opposite is true. In his deposition, Mitchell identified the employees that he believed could terminate other employees, and Kaiser was not listed as one of those employees. (DE # 21-1 at 74-75; Mitchell Dep. 120:2- 121:2.) Additionally, co-owner Iain Hursey testified that Kaiser had no authority to hire or fire any other employees, and in fact, testified that Kaiser was merely one of Mitchell's co-workers. (DE # 21-1 at 28; Hursey Affidavit ¶ 12.) Mitchell's testimony that he considered Kaiser to be his supervisor is not sufficient to raise an issue of fact as to whether Kaiser had authority to take tangible employment actions against him, when the only evidence the court has indicates otherwise. *Wilson v. Moulison North Corp.*, 639 F.3d 1, 10 (1st Cir. 2011) ("[S]tanding alone, an employee's subjective belief is insufficient to create a triable issue of material fact about a coworker's status."). Because Mitchell has failed to direct the court to any evidence that Kaiser had the authority to take tangible employment actions against Mitchell (or any other employee), the court will treat Kaiser as a co-worker for purposes of this analysis.

Mitchell is therefore left with the three images he found on his desk two days before his employment was terminated. First, Mitchell found a note written to him in what he described as Ebonics.[14] (DE # 21-1 at 82; DE # 21-1 at 44-45; Mitchell Dep. 41:19 - 42:25.) Mitchell also found an image of a monkey with a hand over its mouth at his workstation. The image was a legitimate image used in a job for one of defendant's customers. (DE # 21-1 at 46-47; Mitchell Dep. 45:6 - 46:2.) Finally, Mitchell found a piece of paper with the phrase "I am prepared to hoist the black flag. Giving me a reason will start a storm of violence in this country not seen since 1776." A customer had requested this saying to be printed on an order of t-shirts. (DE # 21-1 at 55; Mitchell Dep. 54:3-24; DE # 21-1 at 30.)

Mitchell does not appear to argue that any supervisor was responsible for the black flag or monkey materials found at his work station, and there is no evidence that a supervisor was in any way involved with these incidents. *See Hrobowski,* 358 F.3d at 478. Mitchell does argue, however, that there is a question of material fact regarding

---

[14] The text of that note was as follows:

Dear Dayv,

Do wut Jon sed. That shood keep you bizzy. Even no I wurk today. Have a grate cat n nat.

Tubz

(DE # 21-1 at 82.)

whether manager Scott Tubbs left the note written in what Mitchell described as Ebonics on his desk. (DE # 23 at 12.)

In response, defendant argues that Mitchell testified that he did not know who wrote the letter, and therefore, there is no issue of material fact regarding whether Tubbs wrote the letter. (DE # 26 at 12.) Although Tubbs's last name (spelled incorrectly) was signed at the end of the note, (DE # 21-1 at 82) defendant is correct that Mitchell testified in his deposition that he did not know who wrote the letter. (DE # 23-1 at 61; Mitchell Dep. 42:8-9.) Additionally, in an email to Tubbs, Mitchell stated that he did not believe that Tubbs had written the letter, and also stated that he told defendant's employees that Tubbs had not written the letter. (DE # 21-1 at 85.) Finally, plaintiff apparently reported the letter as having Tubbs's name forged on it. (DE # 21-1 at 44; Mitchell Dep. 54:19-23.) Thus, plaintiff has not raised a genuine issue of material fact as to whether Tubbs wrote the letter.[15]

_____

[15] But, even assuming, for the sake of argument, that Tubbs had written the letter, this fact would still be insufficient to impose strict liability on defendant. As defendant correctly points out in its reply brief, at the time that the letter was found at Mitchell's work station, Mitchell no longer reported to Tubbs. (DE # 26 at 12.) Instead, Mitchell reported to the weekend shift manager, Eric Wilson. (DE # 21-1 at 28; Hursey Aff. ¶ 12.) As noted earlier, an employee is a supervisor "for purposes of vicarious liability under Title VII if he or she is empowered by the employer to take tangible employment actions *against the victim*." *Vance,* 133 S. Ct. at 2454 (emphasis added). Mitchell has failed to direct the court to any evidence that at the time of his termination, when he no longer reported to Tubbs, Tubbs could "take tangible employment actions against" him. *Id.*; *see also Hrobowski,* 358 F.3d at 478 ("[I]t is not enough that [the plaintiff] point to evidence that just anybody with managerial authority was racially abusive; instead, [the plaintiff] must show that the harasser was *his* supervisor."(emphasis in original)). Therefore, even if the letter had been left at Mitchell's work station by Tubbs, it would still not subject defendant to strict liability for the harassment.

In sum, Mitchell has failed to direct the court to any evidence indicating that any of the alleged acts of harassment were perpetrated by a supervisor. Therefore, the court will move on to determine whether defendant was negligent in its response to Mitchell's co-workers' harassment.

### b. Employer Negligence

Because he has failed to present any evidence that a supervisor was involved in the harassment, Mitchell must show that defendant "was negligent in discovering or remedying harassment by his coworkers." *Montgomery,* 626 F.3d at 390. "An employer is only liable for harassment from an employee's co-workers if it was negligent in its response to the harassment." *Chaib,* 744 F.3d at 985; *see also Lambert v. Peri Formworks Systems, Inc.*, 723 F.3d 863, 866 (7th Cir. 2013) ("Here, [the harasser] was a co-worker, and so [the defendant's] liability turns on whether [the plaintiff] adequately alerted the company to the problem."). Although Mitchell does not directly address this issue in his response brief, the court sees two possible ways that defendant could have been alerted to the harassment in this case: Kaiser's awareness of the "Kunta Kinte" and "coon" comments or Mitchell informing Tubbs about the three items found at his work station two days prior to his termination. The court will address each in turn.

As noted earlier, Mitchell testified that Kaiser overheard co-worker Rowe's "Kunta Kinte" comment. (DE # 21-1 at 43-44; Mitchell Dep. 40-41.) Additionally, Mitchell testified that Kaiser showed Mitchell a picture of a raccoon, and then stated: "Coons. Get it? Coons." (DE # 21-1 at 49-52; Mitchell Dep. 48:24 - 54:16.) The question

therefore becomes, whether Kaiser's knowledge of the "coon" and the "Kunta Kinte" incidents is sufficient to impose employer liability.

"Notice that is sufficient to trigger employer liability must be given to either someone with authority to take corrective action or, at a minimum, someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Lambert*, 723 F.3d at 866-67 (citations and quotations omitted). In making this determination, the court must "[f]ocus on whether the information comes to the attention of someone who ought by specification of his duties or, failing that, general norms of management to do something about it, either directly or by referring the matter to some other corporate employee . . . ." *Id.* at 867. Additionally, "[i]f the employer has established a set of procedures for reporting complaints about harassment, the complainant ordinarily should follow that policy in order to provide notice sufficient for the employer to be held responsible, unless the policy itself is subject to attack as inadequate." *Id.*[16]

The only evidence that the court has regarding Kaiser's authority at defendant's workplace is that he could not hire or fire employees. (DE # 21-1 at 28; Hursey Affidavit ¶ 12.) Mitchell fails to direct the court to any evidence that would indicate that Kaiser had any more authority than Mitchell himself or any evidence that Kaiser was in a

---

[16] Defendant's employee handbook states that "[a]ny employee who believes that another employee's words or actions constitute unwelcome harassment has a responsibility to report the situation as soon as possible." (DE # 21-1 at 8.) Although the handbook did not specify who employees should report harassment to, there is no evidence that Mitchell reported either of these instances of harassment to anyone.

position to do something about the incidents he had witnessed. *Compare Parkins v. Civil Constructors of Illinois, Inc.*, 163 F.3d 1027, 1037-38 (7th Cir. 1997) (unreasonable for the plaintiff to believe that fellow employee who the plaintiff considered to be a supervisor would be the type of employee that would convey the plaintiff's complaints of harassment when the employee "exercised no discretion or decision-making authority, other than to assign drivers to the various crews and to the type of truck they drove"), *with Lambert*, 723 F.3d at 867 (reasonable jury could conclude that employee that was expected to report problems up the chain of command had the responsibility to refer complaints to someone that could address the problem).[17] Without any evidence indicating that Kaiser had more job responsibilities than Mitchell or any other employee, no reasonable jury could conclude that a complainant could reasonably expect Kaiser to refer harassment matters to someone that could address the problem. Therefore, Kaiser's knowledge of these two incidents is insufficient to impose liability on defendant.

Mitchell, however, also reported the three items that he found at his desk two days before his employment was terminated to Tubbs.[18] (DE # 22 at 9; DE # 21-1 at 56;

[17] Additionally, Kaiser was the person who actually made the "coon" comment, and "it is unreasonable to expect that [Kaiser] would transmit complaints about himself to [defendant's] management." *Parkins*, 163 F.3d at 1037.

[18] In his deposition, Mitchell testified that he also reported incidents to Kaiser, but did not elaborate on which incidents he reported or when he reported them. (DE # 21-1 at 57; Mitchell Dep. 58.) As discussed earlier, however, there is no evidence that Kaiser was "someone who ought by specification of his duties or, failing that, general norms of management to do something about it, either directly or by referring

Mitchell Dep. 55:6-8.) Tubbs was undoubtedly "someone with authority to take corrective action or, at a minimum, someone who could reasonably be expected to refer the complaint up the ladder to the employee authorized to act on it." *Lambert*, 723 F.3d at 866-67. Thus, the question becomes whether defendant was negligent in its response to Mitchell's complaints about the three items left at his work station two days before he was terminated.[19]

Mitchell, however, does not appear to make any sort of argument that defendant was negligent in its response to Mitchell's complaints about the items left on his work station two days before he was fired. (*See* DE # 23.) And the only evidence the court has regarding what action, if any, defendant took in response to Tubbs being informed about Mitchell's complaint is that Mitchell did not know if defendant took any action in response to his complaint. (DE # 23-1 at 62; Mitchell Dep. 43.) Despite this lack of evidence, the court still concludes that there is no basis for employer liability in this

---

the matter to some other corporate employee . . . ." *Lambert*, 723 F.3d at 867.

[19] Mitchell has not put forth any argument that defendant was on constructive notice about the other instances of racial and religious harassment that he failed to report. *See Mason v. Southern Ill. Univ.,* 233 F.3d 1036, 1046 n.8 (7th Cir. 2000) But even if Mitchell had made this argument, it would still fail because there is insufficient evidence that defendant should have known about the unreported alleged racial and religious harassment. *Cf. Wilson v. Chrysler Corp.,* 172 F.3d 500, 507-09 (7th Cir. 1999) (genuine issue of material fact as to defendant's liability on hostile work environment claim where evidence showed, among other things, that incidents of harassment, including fake penises sent down the plaintiff's assembly line past her work station, nude photographs taped to the car she was working on, and lewd greeting card sent to the plaintiff, signed by numerous employees including a supervisor, took place in a "peculiarly communal employment forum"), *overruling on other grounds recognized by Lee v. City of Salem, Ind.,* 259 F.3d 667 (7th Cir. 2001).

case, as no reasonable jury could conclude that defendant was negligent for failing to correct Mitchell's co-workers' behavior.

Plaintiff has not directed the court to any evidence that he faced any additional harassment after he reported the three items left at his work station to Tubbs.[20] *See Chaib,* 744 F.3d at 985-86 ("[Plaintiff] points to no evidence in the record which establishes that, after reporting a co-worker to her supervisors, she ever had a subsequent problem with that individual.") Thus, any negligence by defendant in investigating and responding to Mitchell's complaint could not have contributed to Mitchell's alleged hostile work environment because Mitchell never experienced any further harassment after reporting the alleged harassment to Tubbs. *Zimmerman v. Cook County Sheriff's Dep't,* 96 F.3d 1017, 1019 (7th Cir. 1996) ("Unless a defendant's wrong is a cause of the plaintiff's injury, there is no liability."); *see also See Hrobowski,* 358 F.3d at 478 ("[Defendant] will not be liable for the hostile environment absent proof that it failed to take appropriate remedial measures *once apprised of the harassment."* (emphasis in original) (citations and quotations omitted)). Therefore, the court concludes that defendant is entitled to summary judgment on Mitchell's hostile work environment claim.

---

[20] Plaintiff also may have reported this incidents to manager Scott Wood on the same day he talked to Tubbs. (DE # 23 at 7; DE # 23-1 at 73; Mitchell Dep. 64:6-11.) This fact does not change the court's analysis.

## IV.     Other Motions

Defendant has moved to strike portions of the evidentiary appendix attached to plaintiffs' response brief. (DE # 24.) In their appendix, plaintiffs have submitted a memorandum written by an EEOC investigator regarding plaintiffs' claims of discrimination. (DE # 23-1 at 48-52.) This memorandum details the investigator's visit to defendant's business to investigate plaintiffs' allegations of discrimination. (*Id.*) Defendant has also moved to strike other parts of the appendix that refer to the EEOC memorandum. (DE # 25 at 2-3.)

The court is only denying defendant's motion for summary judgment as it relates to one claim, and the court did not rely on any of the evidence defendant seeks to strike in reaching that conclusion. (DE # 25.) Therefore, defendant's motion to strike will be denied as moot.

Plaintiffs have also requested that the court set this matter for a status conference. (DE # 27.) That motion will be denied. The parties' attorneys are directed to confer regarding possible trial dates, then contact the undersigned's courtroom deputy for scheduling.

## V.     Conclusion

For the foregoing reasons, defendant Graphic.22 Inc.'s motion for summary judgment (DE # 21) is **GRANTED** as it relates to plaintiff James Williamson's retaliation claim and plaintiff David Mitchell's discriminatory discharge and hostile work environment claims, and **DENIED** as it relates to plaintiff Williamson's discriminatory

43

discharge claim. Defendant's motion to strike (DE # 24) is **DENIED AS MOOT**.

Plaintiffs' motion for a status conference (DE # 27) is **DENIED**.

**SO ORDERED.**

Date: July 21, 2014

s/James T. Moody_____
JUDGE JAMES T. MOODY
UNITED STATES DISTRICT COURT